WOOD, Appellant, v. WYETH et al., Respondents. (Supreme Court, Appellate Division, Second Department. February 11, 1903.) Action by Alice Wood, as administratrix of the goods, chattels, and credits of Robert Wood, deceased, against John A. Wyeth and W. H. Landon White, under Code Civ. Proc. § 1902, to recover damages for malpractice. From a judgment on a verdict for defendant White, and a judgment dismissing the complaint as to defendant Wyeth, plaintiff appeals. Reversed. Jacob Friedman, for appellant. Robert L. Harrison (Robert W. B. Elliott, on the brief), for respondent White. Samuel S. Slater (Ellis L. Aldrich, on the brief), for respondent Wyeth.

PER CURIAM. Judgment and order in favor of defendant Wyeth reversed, and new trial granted, costs to abide the event, on the ground that the trial court was right in leaving the case to the jury, and erred in subsequently dismissing the complaint after the jury failed to agree. Judgment and order in favor of the respondent White unanimously affirmed, with costs.

WOODWARD, J. (dissenting). This action was brought, under the provisions of section 1902 of the Code of Civil Procedure, by the administratrix of one Robert Wood, to recover damages sustained by him for the alleged negligent treating of Robert by the defendants as physicians and surgeons, resulting in his death. The trial of the action resulted in a verdict in favor of the defendant White, but the jury disagreed as to the defendant Wyeth, and the learned trial justice dismissed the complaint upon the merits as to the latter. A motion for a new trial upon the minutes was made and denied, and the appeal is from the judgments and from the order denying the motion.

The court having dismissed the complaint as to the defendant Wyeth, it will be conceded that upon this appeal the plaintiff is entitled to the most favorable construction which might properly be placed upon her evidence by the jury, and we will examine the questions involved with this rule in mind. "The law relating to malpractice," say the court in Pike v. Honsinger, 155 N. Y. 201, 209, 49 N. E. 760, 762, 63 Am. St. Rep. 655, "is simple and well settled, although not always easy of application. A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such

as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been. The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and, to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result." Does the evidence in this case, tried by these rules, warrant the submission of this case to the jury, in so far as the defendant Wyeth is concerned? If it does not, the mere question of whether the complaint should have been dismissed upon the merits, or the defendant have been granted a nonsuit, is of only incidental importance. It seems to have been conceded that the defendant Wyeth is a physician and surgeon of more than ordinary ability, who was employed as house surgeon at the Polyclinic Hospital on East Thirty-Fourth street, New York City, and the evidence is conclusive that his assistants were fully qualified to perform their duties. On the 8th day of November, 1900, Mrs. Alice Wood, the plaintiff, having previously discovered that her son Robert, a boy 11 years of age, had something the matter with his right arm, sent the boy, in the care of one Agnes Evans, a woman 26 years of age, to the Polyclinic Hospital for treatment. The boy arrived at the hospital at about 20 minutes after 10 o'clock in the morning, and was there examined by the attending physicians. Dr. Joseph A. Robertson, who was Dr. Wyeth's assistant, was in the habit of preceding the latter and looking over the patients, selecting such as seemed to require Dr. Wyeth's attention, and on this morning arrived at the hospital a little before 11 o'clock, and found Agnes Evans and the boy Robert in waiting. He made an examination of the boy, and found conditions pointing to blood poisoning, and, although there is testimony that this preliminary examination was made by Dr. White, the circumstances seem to clearly indicate that this is a mistake, and that it was Dr. Robertson who acted. Dr. Wyeth was then called upon, and made an examination of the boy, and decided that he was suffering from blood poisoning, and he swears that he told Agnes Evans of the result of his examination—that it was necessary to perform an operation at once, and that, in order to do this without unnecessary pain to the patient, it would be necessary to administer an anæsthetic. He also says that Agnes Evans told him to go ahead and to do the best he could for the boy. The plaintiff testifies, in reference to her son, that "on the 8th day of November, 1900, I sent him to the Polyclinic Hospital, over in New York, in Thirty-Fourth street, between Second and Third avenues—somewhere there. That is a free hospital, where they dispense medical services to patients free. I sent Agnes Evans with him. She is in court now. * * * I sent Agnes Evans with the boy to the hospital

to see what was the matter with his arm, just to be examined." But it does not appear in the evidence that Agnes Evans ever made any statement to the defendants, or to either of them, of any limitation upon the purpose of the visit, and so far as appears from the evidence there was nothing to suggest to the defendants that Robert had not been submitted to their care with authority to do whatever the circumstances seemed to warrant. Agnes Evans does not pretend that she told the defendants that the purpose of her visit was merely for an examination, and that she had no authority to submit the boy to their care; and the only thing in the evidence from which a conflict may be inferred is that she says "neither of these doctors said anything else to me. They did not tell me that they were going to perform an operation on the boy." The gravamen of the complaint is that "the said Robert Wood employed defendants as such physicians and surgeons to attend him and cure him of certain pains which he had in his right arm, and said defendants as such physicians and surgeons undertook faithfully, skillfully, and diligently to treat and cure said Robert Wood of said pains," and that "the defendants so carelessly, negligently, unskillfully, and improperly conducted themselves in and about the said treatment of said Robert Wood for his pains aforesaid that solely by reason thereof, and without any fault or neglect on the part of the said Robert Wood, or of said Agnes Evans, or of this plaintiff, and while still under the care and treatment of the said defendants for said illness, on said day as aforesaid, said Robert Wood died."

The employment of the defendants by Robert Wood appears to have been with the knowledge and consent of the mother, the plaintiff in this action; and, in the absence of some evidence that the defendants knew that they were not expected to act without further authorization, there was no question which might properly be submitted to the jury. Why should the defendants, employed by Robert Wood, with the consent of his mother, who had sent him there for the purpose, be expected to ask Agnes Evans for permission to perform an operation which to them appeared necessary, and which, under ordinary circumstances, would have been a very simple matter? When we call a physician or surgeon, we submit our case to his care. We act upon the assumption that he knows more about the matter than we do, and consent is given by implication for him to do whatever appears to be necessary or proper for our relief; and, in the absence of some evidence to show that the defendants had notice that their services were only to go to the extent of an examination, it cannot be said that the defendants were guilty of negligence of any duty owed to the plaintiff or her son in not asking Agnes Evans for her consent to the operation. If the operation, considered in its surgical aspects, was one of great peril, it might be that the defendants would not be justified in proceeding without consultation with the mother, or some person of suitable age authorized to act for her; but it appears from the evidence, without dispute, that the operation was of a very simple character, not likely to be attended with seri-

ous results, and that the cause of the patient's death was, not the surgical operation, but the chloroform, which, in the peculiar condition of the boy, resulted fatally. There was, as appears from the evidence, no reason which was apparent why the boy could not undergo the administration of chloroform and the operation without danger; and, as the plaintiff alleges the employment of these defendants "to attend him and to cure him of certain pains in his right arm," it is hardly consistent in her to now claim that the employment was only for the purpose of an examination. The two positions cannot be supported at the same time; and, if the allegations of the complaint are true, the defendants were not negligent in doing whatever in their best judgment was calculated to produce the result for which they were employed. Pike v. Honsinger, supra. Under the facts here disclosed, the defendants had a right to assume that the boy was there for treatment, and that his case was submitted for their judgment and action; and it would be contrary to law to hold that the fact that they did not disclose their intention of operating upon the boy, if this was a fact, to Agnes Evans, who does not appear to have suggested any limitation upon their right to treat the patient under their employment, as alleged in the complaint, rendered them liable in an action of this character. We find no authority holding a contrary doctrine, and it would be holding the employés of a charitable hospital to a high degree of responsibility to say that they must notify the guardians of every patient brought to them for treatment before they can perform the simplest of surgical operations, under pain of being called upon to pay damages in the event of unexpected fatalities.

The evidence as to the details of the administering of the anæsthetic, which is not contradicted, shows that the defendants proceeded with due care, using approved methods, watching the patient carefully, with their fingers upon his pulse, and that only so much of the chloroform as was necessary to place the patient under its influence was used; that as soon as the boy lapsed into unconsciousness the defendant Wyeth made an incision in the boy's arm, taking out about two teaspoonfuls of pus; that just as the operation was completed the boy underwent a slight convulsion, and his heart ceased to beat; and that every effort known to the profession was made to start the heart action, without result. It is not claimed that the operation was unskillfully performed, and the evidence is uncontradicted that the death resulted from the chloroform, not from the operation. It is urged, however, that under the authorities it is dangerous to administer chloroform to one who has eaten heartily immediately before the operation, and there is evidence in the case that the boy had eaten breakfast at about 8 o'clock in the morning, and that he had consumed a very large quantity of ham, pork, bread, etc. A large part of the evidence, and of the hypothetical questions which were propounded, were based upon the proposition that with this condition of affairs it was negligent for the defendants to administer chloroform, and there was considerable evidence as to the

effect and the practicability of using local, instead of general, anæsthetics; but the most that can be said in favor of the plaintiff's position is that it demonstrated that there was a difference of opinion as to what should be done under the circumstances. On the question of the amount of food in the boy's stomach, and which it is claimed made the administering of the chloroform dangerous, there is the testimony of what he had eaten; there is the testimony of Dr. Wyeth, that the boy told him he had eaten some meat and bread at breakfast; and there is the testimony of the coroner's physician, who made an autopsy in the afternoon of the day that the boy died, and his testimony is absolutely without contradiction that the stomach contained no solids, and that there was no condition of the boy, which could be discovered without an autopsy, which would make it appear to those called upon to decide that it would be dangerous to give chloroform. It is conceded that, if the food had been digested and had passed out of the stomach, the condition making the administering of chloroform dangerous on account of having eaten heartily would have passed away. Plaintiff's own expert admitted that, as between ether and chloroform, the latter was to be preferred, though he insisted that a local anæsthetic should have been used. If the food which the boy had taken into the stomach was digested, and there was nothing but fluid in the stomach at the time of the operation—and this appears to be established by the autopsy, which is in no wise contradicted—the fact that it would be dangerous to give chloroform upon a full stomach does not make the defendants guilty of any neglect of duty toward the plaintiff's intestate; for it is not shown that death resulted from this cause. Indeed, the death of the boy was due, as testified to by the coroner's physician (who is not disputed, except upon hypothetical questions based upon the assumption that the boy had eaten heartily, and that the food had not been digested at the time of administering the anæsthetic), to the fact that his glandular system was in a condition known as status lymphaticus, a condition in which the administration of an anæsthetic is likely to prove fatal, and which condition cannot be discovered in life. The known fact, resting upon no hypothesis, and without dispute, that the boy's stomach did not contain solids at the time of the operation, completely disposes of all contention of negligence based upon the alleged fact that the boy was in an improper condition to take chloroform; and it appears that this was determined upon, instead of ether, on the theory that, if the boy had eaten bread and meat, chloroform was less apt to make him vomit than ether, and that the dangers of strangulation by drawing particles of meat into the throat would thus be lessened. But it appears affirmatively that there was no danger of this, or of the other effects of chloroform due to a full stomach, because of the fact that the stomach was without solids at the time of death. The condition of the boy's system which made the administering of chloroform dangerous was such that it could not, it appears, be determined without an autopsy. It is entirely

obvious that negligence could not be predicated upon the fact that the defendants did not discover this condition while the boy was yet alive; and, as the death was due, not to the operation, but to the administering of the chloroform, it is apparent that the defendant Wyeth is in the same position, in law, as Dr. White, who was acquitted by the jury; and, if that verdict may be sustained, it is not apparent why the complaint should not have been dismissed as to the defendant Wyeth.

Our attention is called to groups of questions of a hypothetical nature, which were excluded by the court, and we are asked to hold that these rulings constitute reversible error. We are given no intimation of the view which the appellant holds upon any particular exception; but from an examination of the questions we are unable to discover that they were free from objections, and we conclude that the rulings were right, particularly as the appellant does not appear to be able or willing to point out the particular error relied upon. We are likewise asked to hold that reversible error appears in the rulings of the learned trial court in reference to certain matters upon cross-examination; but we fail to discover these alleged errors. The scope of a cross-examination is largely within the control of the court (1 Greenleaf on Evidence, 456a), and so far as we discover the plaintiff had a full opportunity to bring out all matters pertinent to the issue. It may be said, also, that in the matters excluded by the court they were, for the most part, admitted when properly formulated; and after a careful examination of the case we are unable to discover how the plaintiff could be bettered in her situation if all of the matters as to which she sought to bring out testimony had been admitted without objection. She has failed to bring the defendants within the rules laid down in the case cited at length in the early part of this discussion. She has failed to show that the defendants were guilty of neglect of any duty which they owed to her intestate. The jury having found against her as to one of the defendants, there is no reason in law why the judgment should not extend to both; for the negligence, if there was negligence, resulting from the administering of chloroform. We have seen by the uncontradicted evidence in this case that there was no negligence in the matter of administering the anæsthetic upon a full stomach; for there was no such condition, while the glandular condition of the boy which made the anæsthetic fatal was not discoverable without an autopsy. Speculation and hypothetical evidence upon the dangers of administering chloroform under certain conditions, when those conditions are shown not to have existed, are not a proper basis for liability for negligence, and without this dangerous condition the plaintiff has failed utterly in her case. The judgments and order appealed from should be affirmed, with costs.

GOODRICH, P. J., concurs.